## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **RICHARD TURNLEY III, BARON H.C. FINLAYSON, COLEEN ALECIA HINDS, MARK-ANTHONY BROWN, TIMOTHY JOHNSON II, KHAIRI DWAYNE RAHMAN, RAHMEL HOBBS, and TERRY M. GRAVELY, on behalf of themselves and all others similarly situated,** | ) ) ) ) ) ) ) ) | |
| | ) | **CIVIL ACTION NO. 07-CA10949 NG** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) ) | |
| **BANC OF AMERICA INVESTMENT SERVICES, INC., and BANK OF AMERICA, N.A.,** | ) ) ) ) | |
| **Defendants.** | ) ) ) ) | |

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR FINAL APPROVAL OF SETTLEMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     DESCRIPTION OF THE LITIGATION.................................................................... 4

III.    THE ARM'S-LENGTH SETTLEMENT NEGOTIATIONS ........................................ 5

IV.     THE SETTLEMENT WARRANTS FINAL APPROVAL................................................ 6

        A.      The First Circuit Standard For Approval Of Class Action
                Settlements.................................................................................................. 6

                1.      The Litigation Risks Support Approval Of The Settlement ...................... 8

                2.      The Range Of Reasonableness Of The Settlement In Light
                        Of The Best Possible Recovery Supports Approval ................................ 10

                3.      The Stage Of The Proceedings And Extent Of Discovery
                        Completed Support Approval ................................................................. 12

                4.      The Complexity, Expense And Likely Duration Of The
                        Litigation Support Approval .................................................................. 13

                5.      The Reaction Of The Class Supports The Settlement ............................. 14

                6.      The Experience Of Class Counsel Supports Approval ........................... 15

                7.      The Proposed Settlement Is The Product Of Informed
                        Arm's-Length Negotiations ................................................................... 16

V.      THE DIRECT NOTICE TO CLASS MEMBERS SATISFIES DUE
        PROCESS REQUIREMENTS AND IS REASONABLE................................................ 16

VI.     THE PLAN OF ALLOCATION SHOULD BE APPROVED ........................................ 17

VII.    THE SERVICE AWARDS SHOULD BE APPROVED ................................................. 18

VIII.   CONCLUSION...................................................................................................... 20

# TABLE OF AUTHORITIES

**CASES**                                                                                           **PAGE(S)**

*Amochaev v. Citigroup Global Markets, Inc.*,
    Case No. 3:05-cv-01298 (N.D. Cal. 2008) ............................................................19

*In re Automotive Refinishing Paint Antitrust Litig.*,
    2008 WL 63269 (E.D. Pa. Jan. 3, 2008) ...............................................................20

*Bussie v. Allmerica Fin. Corp.*,
    1999 WL 342042 (D. Mass. May 19, 1999) ......................................................2, 18

*Bussie v. Allmerica Fin. Corp.*,
    50 F. Supp. 2d 59 (D. Mass. 1999) .............................................................4, 14, 15

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981) ................................................................................................6

*City P'Ship Co. v. Atl. Acquisition Ltd. P'Ship*,
    100 F.3d 1041 (1st Cir. 1996) ..............................................................................6

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    216 F.R.D. 197 (D. Me. 2003) .............................................................................17

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    292 F. Supp. 2d 184 (D. Me. 2003) .....................................................................20

*Cooper v. Southern Co.*,
    390 F.3d 695 (11th Cir. 2004) ...............................................................................8

*Curtis-Bauer v. Morgan Stanley & Co., Inc.*,
    2008 WL 4667090 (N.D. Cal. Oct. 22, 2008) ..................................................3, 19

*Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ........................................................................ passim

*Durrett v. Hous. Auth. of Providence*,
    896 F.2d 600 (1st Cir. 1990) ................................................................................6

*E.E.O.C. v. Astra USA Inc.*,
    94 F.3d 738 (1st Cir. 1996) ..................................................................................6

*Frank v. Eastman Kodak Co.*,
    228 F.R.D. 174 (W.D.N.Y. 2005) .......................................................................10

*Greenspun v. Bogan*,
    492 F.2d 375 (1st Cir. 1974) .............................................................................7, 8

*Hispanics United v. Village of Addison,*
    988 F. Supp. 1130 (N.D. Ill. 1997) ....................................................................14

*Ingram v. Coca-Cola Co.,*
    200 F.R.D. 685 (N.D. Ga. 2001)...................................................................19, 20

*Key v. Gillette Co.,*
    90 F.R.D. 606 (D. Mass. 1981)........................................................................17

*In re Lorazepam & Clorazepate Antitrust Litig.,*
    205 F.R.D. 369 (D.D.C. 2002) .........................................................................14

*In re Lupron Mktg. & Sales Practices Litig.,*
    2005 WL 2006833 (D. Mass. Aug. 17, 2005) .................................................2, 18

*In re Lupron Mktg. & Sales Practices Litig.,*
    228 F.R.D. 75 (D. Mass. 2005)...........................................................................8

*Nat'l Ass'n of Chain Drug Stores v. New Eng. Carpenters Health Benefits Fund,*
    __ F.3d __, 2009 WL 2824867 (1st Cir. Sept. 3, 2009)......................................7

*New Eng. Carpenters Health Benefits Fund v. First DataBank, Inc.,*
    602 F. Supp. 2d 277 (D. Mass. Mar. 17, 2009) .................................................8

*Nilsen v. York County,*
    382 F. Supp. 2d 206 (D. Me. 2005) ..................................................................17

*In re Nortel Networks Corp. Sec. Litig.,*
    2006 WL 3802198 (S.D.N.Y. Dec. 26, 2006) ..................................................12

*Officers for Justice v. Civil Service Comm'n of City and County of San Francisco,*
    688 F.2d 615 (9th Cir. 1982) ...........................................................................13

*In re Relafen Antitrust Litig.,*
    231 F.R.D. 52 (D. Mass. 2005)...........................................................................6

*Roberts v. Texaco, Inc.,*
    979 F. Supp. 185 (S.D.N.Y. 1997)....................................................................19

*Rolland v. Cellucci,*
    191 F.R.D. 3 (D. Mass. 2000)..................................................................6, 15, 16

*Turnley v. Banc of Am. Inv. Servs., Inc.,*
    576 F. Supp. 2d 204 (D. Mass. 2008) ........................................................5, 9, 13

*In re Tyco Int'l, Ltd.,*
    535 F. Supp. 2d 249 (D.N.H. 2007)..................................................................17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
 396 F.3d 96 (2d Cir. 2005)..................................................................................................14

*Watson v. Ft. Worth Bank and Trust,*
 487 U.S. 977 (1988)..........................................................................................................13

## STATUTES

42 U.S.C. § 1981..................................................................................................................4, 9

Title VII of the Civil Rights Act of 1964...........................................................................4, 6, 9

Fed. R. Civ. P. 23(e)(1)........................................................................................................7, 17

Pursuant to the Court's July 15, 2009 Order ("Preliminary Approval Order"), Named Plaintiffs Richard Turnley III, Baron H.C. Finlayson, Coleen Alecia Hinds, Mark-Anthony Brown, Timothy Johnson II, Khairi Dwayne Rahman, Rahmel Hobbs and Terry M. Gravely ("Named Plaintiffs" or "Plaintiffs"), on behalf of themselves and the Class, hereby move for final approval of the Settlement and Plan of Allocation and approval of Service Awards.

## I.    PRELIMINARY STATEMENT

Plaintiffs achieved a Settlement with Defendants Bank of America N.A. ("BOA") and Banc of America Investment Services, Inc. ("BAI"); collectively "the Bank" or "Defendants"), for $7.2 million plus interest, plus important Programmatic Relief.[1]  The Settlement is the result of arm's-length negotiations and was achieved with the assistance of Hunter R. Hughes, Esq., a respected mediator with extensive experience mediating discrimination class actions.  *See* Declaration Of Steven B. Singer submitted herewith (the "Singer Declaration") ¶¶6, 41-43.

The Settlement amount of $7.2 million clearly falls within the "range of reasonableness" and provides a significant and material benefit to the Class.  Indeed, Plaintiffs' statistics expert estimated likely maximum recoverable back-pay damages – if Plaintiffs succeeded at trial on all claims – to be approximately $12 million.  Defendants contested whether there were any damages at all.  Thus, even under Plaintiffs' estimates, the Settlement is approximately ***60%*** of the likely maximum recoverable damages.  *Id.* ¶3.

---

[1] The specific terms of the Settlement are set forth in the Settlement Agreement dated June 30, 2009 ("Settlement Agreement"), previously filed as Exhibit 2 to the parties' joint motion for preliminary approval of the Settlement (Document #131-3).  Unless otherwise stated herein, capitalized terms are defined as stated in the Settlement Agreement.

As detailed in the Class Notice, the Settlement Fund will be distributed to Class Members who timely submit completed Claim Forms and Releases. If all Class Members submit these documents, the recovery amounts to an average of over $14,000 per Class Member net of fees and expenses. The Settlement also provides for important Programmatic Relief intended to enhance opportunities for employment, earnings and advancement of African American Financial Advisors ("FAs") and Premier Client Managers ("CMs"), and to provide a workplace that promotes fairness for all employees. As recommended by the Mediator, the parties were able to reach agreement in the areas of communications, training, diversity monitoring, and the hiring of an independent Industrial Psychologist. The Programmatic Relief will remain binding on the parties for a two-year period. *See* Settlement Agreement, Section III.B, Section VII.

The Class Members will release all race and/or color discrimination claims that were or could have been included in the Second Amended Complaint against Defendants and their related parties. The Named Plaintiffs will give a general release of any and all claims against Defendants and their related parties.

To compensate them for the time and effort they devoted to representing the Class, Plaintiffs request that the Court approve incentive payments, *i.e.,* "Service Awards," for each of the eight Named Plaintiffs. "Incentive awards serve an important function in promoting class action settlements, particularly where, as here, the named plaintiffs participated actively in the litigation."[2] Furthermore, the amount of the Service Awards requested here – $25,000 each – is

---

[2] *In re Lupron Mktg. & Sales Practices Litig.*, 2005 WL 2006833, at *7 (D. Mass. Aug. 17, 2005); *see also Bussie v. Allmerica Fin. Corp.*, 1999 WL 342042, at *3 (D. Mass. May 19, 1999) (noting "important public policy of fostering enforcement of laws and rewarding representative plaintiffs for being instrumental in obtaining recoveries for persons other than themselves").

less than or equal to service awards granted in other recent discrimination cases.  *See, e.g.,*
*Curtis-Bauer v. Morgan Stanley & Co., Inc.,* 2008 WL 4667090 (N.D. Cal. Oct. 22, 2008)
(approving $25,000 service award plus $125,000 for release of non-class claims).

On July 15, 2009, the Court granted preliminary approval of the Settlement, certified the
Class, and ordered the Claims Administrator to send the Notice of the Settlement to Class
Members.[3]   In addition to advising Class Members of the terms of the Settlement and the
requests for attorneys' fees and expenses and Service Awards, the Notice describes the Plan of
Allocation for distributing the net Settlement Fund.  Here, the Plan of Allocation, created in
consultation with Plaintiffs' statistics expert, contains two components making up each Class
Member's "Total Award":  the "Base Award" and the "Earnings Regression Award," as
discussed below.  Singer Decl. ¶¶57-58.

The deadline for Class Members to file objections was September 18, 2009.
Significantly, in response to the Notices **sent directly** to the 514 Class Members, **no Class
Member has objected** to the Settlement, the Plan of Allocation, the Service Awards, or Class
Counsel's fee and expense request.  Moreover, the Claims Administrator has received only four
exclusion requests.  Although the claims deadline is still two months away, already 182 Class
Members (over 35% of the Class) have submitted Claim Forms.  *See* Declaration of Jonathan
Paul ("Paul Decl.") ¶¶13-14, attached as Exhibit A to the Singer Decl.  The favorable reaction of

---

[3]   The Class is defined as follows: All African Americans employed as FAs or CMs in the
Premier Banking & Investments division of Bank of America at any time between April 1, 2003,
and March 24, 2009.  The bases for granting certification of the Class are set forth in Plaintiffs'
Memorandum Of Law In Support Of The Unopposed Joint Motion For (1) Preliminary Approval
Of Class Action Settlement, (2) Certification Of Settlement Class, (3) Approval Of Notice Of
Settlement, And (4) Approval Of A Schedule For The Final Settlement Approval Process
(Document #132), previously filed with the Court, and incorporated by reference herein.

the Class – especially after direct notice – is compelling evidence that the Class views the Settlement as reasonable and adequate. *See Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 72 (D. Mass. 1999) (citation omitted).

## II.   <u>DESCRIPTION OF THE LITIGATION</u>

This action alleges that the Bank discriminated against African American FAs and CMs nationwide with respect to compensation, hiring, promotion, termination, training, access to financial accounts and business and distribution of employee account assignments.  For example, the Complaint alleges that the Bank partnered African American FAs with African American CMs and then steered these minority partnerships to low net-worth sales territories comprised largely of minority client pools.

On May 18, 2007, certain plaintiffs filed the initial complaint, asserting claims against the Bank under 42 U.S.C. § 1981, as amended ("§ 1981"), and Mass. Gen. Law Ch. 151B ("c.151B").  On August 20, 2007, Defendants filed an Answer and motions to dismiss or transfer.  Plaintiffs opposed Defendants' motions and, on November 13, 2007, sought leave to amend the complaint to add a claim on behalf of Khairi Dwayne Rahman and to add a claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), et seq. ("Title VII").  The Court granted plaintiffs' motion and denied Defendants' motions as moot.  Plaintiffs filed the Amended Complaint on November 29, 2007.

On December 21, 2007, Defendants filed a new Answer to the § 1981 claim, and motions to transfer the § 1981 claim, to dismiss the c.151B claim, and to dismiss or transfer the Title VII claim.  Plaintiffs opposed the motions and sought leave to amend the complaint to add a claim on behalf of Rahmel Hobbs.  On July 28, 2008, plaintiffs sought leave to amend the complaint to add a claim on behalf of Terry M. Gravely.

By Order dated September 17, 2008, the Court granted plaintiffs' motion to amend the complaint and denied Defendants' motions to dismiss or transfer.  *See Turnley v. Banc of Am. Inv. Servs., Inc.,* 576 F. Supp. 2d 204 (D. Mass. 2008).   On September 17, 2008, Plaintiffs filed the operative complaint, the Second Amended Complaint ("Complaint").

As detailed in the accompanying Singer Declaration, Plaintiffs engaged in extensive discovery, including reviewing approximately two million pages of documents and voluminous databases of employment-related information; taking nine depositions; and consulting with their experts in order to analyze the pay disparities between the Class Members and their Caucasian counterparts.  Singer Decl. ¶¶16-32.

## III.    THE ARM'S-LENGTH SETTLEMENT NEGOTIATIONS

On March 30 and March 31, 2009, the parties mediated before Hunter R. Hughes, Esq. Counsel for the parties are experienced class action attorneys who retained Mr. Hughes because of his expertise in mediating complex employment discrimination class actions.   Two of the Named Plaintiffs, Richard Turnley III and Baron H.C. Finlayson, attended in person and actively participated in the mediation session. After two full days of intense arm's-length negotiations, the parties successfully reached an agreement in principle to settle the action.  *Id.* ¶¶41-43. Immediately upon reaching the agreement in principle, Class Counsel undertook the process of drafting, discussing and finalizing the Settlement Agreement and exhibits.  *Id.* ¶43.   Over the next few months, Class Counsel held extensive sessions with counsel for Defendants to complete the Settlement Agreement, which was executed on June 30, 2009.

On July 2, 2009, the parties filed the joint motion for preliminary approval of the Settlement.  Following a hearing, on July 15, 2009, the Court granted preliminary approval of the Settlement, certified the Class, authorized sending the Notice, and set a final approval hearing for

November 18, 2009.  As described in the Paul Declaration, the Claims Administrator provided direct notice of the Settlement to the Class Members.  Paul Decl. ¶10.

On July 21, 2009, the Settlement Fund of $7.2 million was deposited into an escrow account, earning interest for the benefit of the Class.  The entire Settlement Fund, plus interest (after deduction of Court-approved expenses and attorneys' fees), will be distributed to Class Members who submit valid Claim Forms.

## IV.    THE SETTLEMENT WARRANTS FINAL APPROVAL

### A.    The First Circuit Standard For Approval Of Class Action Settlements

Courts consistently recognize "the clear policy in favor of encouraging settlements," especially in the class action context.[4]  This truism holds with particular force in the employment discrimination context, as courts emphasize that "public policy strongly favors encouraging voluntary settlement of employment discrimination claims."[5]  "[I]n enacting Title VII, Congress expressed a strong preference for encouraging voluntary settlement of employment discrimination claims." *Carson,* 450 U.S. at 88 n.14.  "When sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement."[6]

---

[4] *Durrett v. Hous. Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990) (reversing denial of approval of class action settlement as an abuse of discretion); *see also In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 68 (D. Mass. 2005) (citations omitted).

[5] *E.E.O.C. v. Astra USA Inc.*, 94 F.3d 738, 744 (1st Cir. 1996) (citing *Carson v. Am. Brands, Inc.,* 450 U.S. 79, 88 n.14 (1981)).

[6] *City P'Ship Co. v. Atl. Acquisition Ltd. P'Ship*, 100 F.3d 1041, 1043 (1st Cir. 1996) (citation omitted); *see also Rolland v. Cellucci,* 191 F.R.D. 3, 6 (D. Mass. 2000).

Under Rule 23(e) of the Federal Rules of Civil Procedure, a class action may be settled upon notice of the settlement to class members, and a court finding, after a hearing, that it is fair, reasonable and adequate.  The First Circuit recently confirmed that it has not established a formal protocol for assessing the fairness of a settlement, but rather looks to "laundry lists of factors, most of them intuitively obvious and dependent largely on variables that are hard to quantify." *Nat'l Ass'n of Chain Drug Stores v. New Eng. Carpenters Health Benefits Fund,* __ F.3d __, 2009 WL 2824867, at *9 (1st Cir. Sept. 3, 2009).  "[U]sually, the ultimate decision by the judge involves balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement." *Id.* (citations omitted.)  "[A]ny settlement is the result of a compromise – each party surrendering something in order to prevent unprofitable litigation, and the risks and costs inherent in taking litigation to completion.  A district court, in reviewing a settlement proposal, need not engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial."  *Greenspun v. Bogan*, 492 F.2d 375, 381 (1st Cir. 1974) (citations omitted).

As recently recognized by Judge Saris, "[i]n this Circuit, many courts have relied on the factors set forth by the Second Circuit to determine the fairness of a settlement," commonly referred to as the *Grinnell* factors:

> (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of

reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[7]

It is Class Counsel's informed opinion that, given the uncertainty and further substantial expense and delay of pursuing this action, the proposed Settlement is fair, reasonable and adequate, and in the best interests of the Class.  Singer Decl. ¶¶3, 6, 90.

## 1.    The Litigation Risks Support Approval Of The Settlement

In evaluating the fairness, reasonableness and adequacy of a settlement, courts consider "the risks of establishing liability," "the risks of establishing damages," and "the risks of maintaining the class action through the trial."  *Grinnell,* 495 F.2d at 463.  As explained by the First Circuit, "any settlement is the result of a compromise – each party surrendering something in order to prevent unprofitable litigation, and the risks and costs inherent in taking litigation to completion.  A district court, in reviewing a settlement proposal, need not engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial."  *Greenspun*, 492 F. 2d at 381 (citations omitted).

Here, plaintiffs considered certain undeniable risks in assessing a potential settlement. Plaintiffs recognized that obtaining class certification would be difficult as their claims were based largely on the Bank's policies and practices of decentralized decision-making at the local level (with respect to territorial and partnership assignments).[8]  The Bank argued in two rounds of motions to dismiss and transfer that it had no Company-wide policies or practices for

_____

[7] *New Eng. Carpenters Health Benefits Fund v. First DataBank, Inc*., 602 F. Supp. 2d 277, 280-81 (D. Mass. Mar. 17, 2009) (quoting *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974); citing *In re Lupron Mktg. & Sales Practices Litig.,* 228 F.R.D. 75 93-94 (D. Mass. 2005).

[8]  At least some courts have held that such decentralized subjective decision-making practices preclude class certification.  *See, e.g., Cooper v. Southern Co.,* 390 F.3d 695, 714-15 (11th Cir. 2004).

assigning partnerships or territories.  Thus, according to the Bank, the class could not be certified, but rather each individual class member had to pursue his or her own claim individually.  *See, e.g., Turnley,* 576 F. Supp. 2d at 209.  Indeed, the Court did not foreclose all possibility of a future transfer or separation of the class action into various individual actions throughout the United States.[9]

Even assuming Plaintiffs were successful in obtaining class certification, they faced significant risk that not all of the asserted claims would survive as class claims, or at all.  For example, Plaintiffs recognized that proving liability under a disparate treatment theory on a class-wide basis would be difficult, as the claims were not based on overt discrimination.  As a result, the Bank would have likely argued that there is no liability under a disparate treatment theory, and thus, the § 1981 claim must be dismissed.  Singer Decl. ¶¶33-35.

Class Counsel also understood that it would be difficult to establish a disparate impact claim.  Defendants would have presented expert testimony that their policies had no disparate impact and that African American employees were not disadvantaged.  *Id.* ¶36. Plaintiffs also faced the risk that certain types of damages would not be recoverable, or for only limited time periods.  For example, the Bank would likely argue that Title VII would limit back pay to two years, and punitive damages would not be recoverable at all.  Had Defendants been successful in limiting the claims to two years, based on Plaintiffs' expert's analysis the damages could have been less than $8 million.  *Id.* ¶36.

---

[9] *Id.* at 218 (noting that "it is unclear which aspects of plaintiffs' claims, if any, will go forward as class claims and which will proceed individually," and indicating that the Court may "revisit the issue once the matter of class certification has been resolved").

### 2.    The Range Of Reasonableness Of The Settlement In Light Of The Best Possible Recovery Supports Approval

The reasonableness of the settlement in light of the best possible recovery and the risks of litigation also weigh in favor of the Settlement.

> The determination whether a settlement is reasonable does not involve the use of a 'mathematical equation yielding a particularized sum.' . . . Instead, 'there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'

*Frank v. Eastman Kodak Co.,* 228 F.R.D. 174, 186 (W.D.N.Y. 2005) (applying *Grinnell* factors and approving settlement) (citations omitted).

Here the substantial monetary amount of the Settlement clearly falls within the "range of reasonableness" and provides a tremendous benefit to the Class considering, *inter alia*, the risks of the litigation as discussed above.  Plaintiffs' statistics expert calculated likely maximum recoverable damages in the form of back pay – if Plaintiffs had succeeded at trial on all claims – in the total amount of approximately $12 million.  In performing this calculation, Plaintiffs' expert reviewed actual compensation data for all FAs and CMs during the Class Period, and performed a linear regression analysis and predicted deviations of observed (African American) values from predicted (Caucasian) values.  Specifically, Plaintiffs' expert used Caucasian data to create regressions which predicted Caucasian FA and CM income over time; applied the regression lines to African American FAs and CMs; and then calculated the discrepancy between what African Americans actually earned and what the Caucasian line predicted they would have earned over time if they had been Caucasian.  His analysis controlled for (1) the job category of FA or CM; (2) the date of the pay period; and (3) length of service.  Singer Decl. ¶¶38-39.

Based on Plaintiffs' experts' analysis, the Settlement Fund constitutes 60% of the likely maximum recoverable damages.  *Id.* ¶48.  As detailed in the Class Notice, the recovery amounts

to an average of over $14,000 per Class Member before deduction of Court-awarded fees and expenses.[10]

The Settlement also provides for significant Programmatic Relief.  Notwithstanding the issues created by Defendants' acquisition of Merrill Lynch & Co. (accompanied by Merrill Lynch's own procedures and policies governing its numerous financial advisors), the parties were able to reach agreement in the following areas:  communications of non-discrimination policies, training to FAs, CMs and their managers regarding non-discrimination policies, the appointment of a Diversity Monitor, and the hiring of an independent Industrial Psychologist. Singer Decl. ¶49.

As the Court recognized at the Preliminary Approval hearing, the Programmatic Relief does not *require* that the Bank implement the Industrial Psychologist's Recommendations.  That is because the Bank would not agree to be bound by any (as yet, unknown) recommended changes in light of its recent acquisition of Merrill Lynch.  The Merrill Lynch acquisition added a great deal of uncertainty with respect to what the Bank's policies and practices would be. Indeed, if the case had proceeded through litigation, the Bank would have likely argued that Plaintiffs were not entitled to *any* injunctive relief because Plaintiffs' primary complaints – the partnership and territorial assignment structure – would no longer be applicable.  Despite the uncertainties associated with the Merrill Lynch acquisition, Class Counsel insisted that some

_____

[10] Plaintiffs' statistics expert has calculated that, under the proposed Plan of Allocation, if the Court approves of the requests for an award of attorneys' fees and expenses and Service Awards, the estimated average recovery for each Class Member who was an FA will be approximately $19,000, and the estimated average recovery for each Class Member who was a CM will be approximately $5,000.  The difference is a result of FAs getting paid more than CMs, and thus the discrepancy between FA Class Members and their Caucasian counterparts was greater than for CMs. *Id*. ¶48.

form of Programmatic Relief be implemented. Thus, pursuant to the Mediator's recommendation, Class Counsel was able to obtain the Bank's agreement to make changes in the four categories listed above, and to set up a collaborative process – including the appointment of both an internal Diversity Monitor and an outside Industrial Psychologist – for reviewing and improving upon the Bank's policies and practices. Class Counsel is confident that, as a result, issues and recommendations for improvement will, at a minimum, be brought to the attention of the Bank's management who are bound, in good faith, to consider whether and how to implement the Recommendations. Class Counsel also insisted – as is included in the Settlement Agreement – that they be informed as to as to which Recommendations the Bank will implement and which it will not. *Singer* Decl. ¶51.[11]

### 3. The Stage Of The Proceedings And Extent Of Discovery Completed Support Approval

The stage-of-the-proceedings and extent-of-discovery factors evaluate whether plaintiffs have "sufficient information to make an informed judgment on the reasonableness of the settlement proposal." *In re Nortel Networks Corp. Sec. Litig.,* 2006 WL 3802198, at *5 (S.D.N.Y. Dec. 26, 2006) (approving settlement under *Grinnell* factors).

The Settlement was reached after two years of hard-fought litigation. Prior to entering into the Settlement, Class Counsel had extensively investigated the relevant facts and law, briefed two rounds of motions to dismiss and motions to transfer, obtained and analyzed approximately 2 million pages of documents, taken nine depositions, filed a motion to compel, and consulted with their experts for an objective evaluation of the claims and the potential

---

[11] One of the *Grinnell* factors – the ability of the defendants to withstand a greater judgment – is not at issue in this case.

defense thereto.  Class Counsel expended over 14,000 hours litigating this case for the benefit of the Class.  Singer Decl. ¶67.   Class Counsel therefore had "sufficient information to make an informed judgment on the reasonableness of the settlement proposal." *Id.*

### 4.   The Complexity, Expense And Likely Duration Of The Litigation Support Approval

Courts have repeatedly recognized that employment discrimination litigation is particularly "complex," and requires tremendous expense and lengthy duration.[12]  This case is no exception.  Indeed, the Court previewed some of the complex legal and factual issues involved in this case when ruling on Defendants' motions to dismiss and transfer.  *See, e.g., Turnley,* 576 F. Supp. 2d 204.  Issues regarding which claims would survive to trial, and whether they would be on a class or individual basis, would need to be resolved.  Even if liability could be proven, establishing the recoverability of damages – including what types of damages and in what amounts – would be complicated, requiring extensive expert analysis.  Singer Decl. ¶36.

Absent this Settlement, the litigation would likely continue for years and the ultimate result of further litigation cannot be foreseen.  The Settlement confers an immediate and valuable cash benefit to Class Members and substantial Programmatic Relief to address alleged systematic discrimination.  Given the complexities and continued risks and expense if litigation continued, the Settlement presents a reasonable resolution and eliminates the risk that the Class might not otherwise recover.

---

[12] *See, e..g, Watson v. Ft. Worth Bank and Trust,* 487 U.S. 977, 995 n.3 (1988) (noting "complex area of employment discrimination"); *see also Officers for Justice v. Civil Service Comm'n of City and County of San Francisco,* 688 F.2d 615, 625-26 (9th Cir. 1982) (settlement is "the preferred means of dispute resolution," especially "in complex class action litigation, and even more so where the subject matter is employment discrimination").

5.      **The Reaction Of The Class Supports The Settlement**

The number of objections and opt-out requests is relevant to assessing the fairness, reasonableness, and adequacy of settlement.  *See, e.g., Bussie*, 50 F. Supp. 2d at 77.  Here, not only is the Settlement supported by the Named Plaintiffs – two of whom personally participated in the mediation – but the Class supports it as well.  The Claims Administrator provided direct Notice of the Settlement to the Class Members.  Paul Decl. ¶10.  The deadline for Class Members to exclude themselves from the monetary component of the Settlement or to object to any aspect of the Settlement (including the Settlement, the proposed Plan of Allocation, the Service Awards or Class Counsel's fee and expense request) expired on September 18, 2009.  In response, there are ***no objections to any aspect of the Settlement***, and only four opt-out requests.[13]  Moreover, although the claims deadline is not until December 18, 2009, 182 Class Members (or over 35% of the Class) have already submitted Claim Forms.  *Id.* ¶13.  This overwhelming support by the Class supports approval of the Settlement.[14]

As recognized by Judge Gorton, resolution of Class Members' claims in this District – BAI's principal place of business – is particularly appropriate. He explained as follows:

> Looking at these factors, the Court finds that the individual members of the Class have relatively little interest in conducting separate lawsuits, as evidenced by the fact that so few have excluded themselves from the litigation. The Court also

---

[13] *Id.* ¶¶14-15.  Those excluding themselves are listed in Ex. A to the Paul Decl.

[14] *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 119 (2d Cir. 2005) ("Indeed, the favorable reaction of the overwhelming majority of class members to the Settlement is perhaps the most significant factor in our *Grinnell* inquiry."); *see also Bussie*, 50 F. Supp. 2d at 72; *In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 398 (D.D.C. 2002) (noting the fact that an "overwhelming majority of class members elected to stay in the class" after direct mailing of notice, "evidences a favorable reaction by the class to the settlement); *Hispanics United  v. Village of Addison,* 988 F. Supp. 1130, 1169 (N.D. Ill. 1997) (finding compelling that small number of persons objected to the settlement following direct notice).

finds that it is in the interests of the Class and justice to have all claims concerning [defendant's] alleged wrongdoing resolved in one forum and, further, that the District of Massachusetts is a particularly appropriate venue given that it is the location of [defendant's] principal place of business.

*Bussie*, 50 F. Supp. 2d at 72.

## 6.     The Experience Of Class Counsel Supports Approval

"When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight." *Rolland*, 191 F.R.D. at 10 (citing *Bussie*, 50 F. Supp. 2d at 72).

This action has been litigated for over two years by experienced and competent counsel on both sides.  Class Counsel have many years of experience in litigating class actions and other complex litigation, including employment discrimination class actions throughout the country.[15] They conducted a sophisticated and extensive investigation into the claims and defenses asserted, conducted multiple interviews with Class Members, reviewed and analyzed the extensive document production, took numerous depositions, and consulted with experts.  Class Counsel also briefed two rounds of motions to dismiss or transfer, and were in the process of compiling the class certification motion.  Thus, by the time settlement discussions began, Class Counsel had a solid understanding of the strengths and weaknesses of the claims, both factually and legally, and were able to engage in a rigorous negotiation process with counsel for Defendants.

Throughout the litigation and settlement negotiations, Defendants were represented by experienced counsel from the prominent law firms of Bingham McCutchen LLP and Covington

---

[15]  *See* Firm Resume of BLB&G, attached as Ex. C to the Singer Declaration.

& Burling LLP.   Their representation of the Defendants was no less rigorous than Class

Counsel's representation of the Class.  Singer Decl. ¶73.

**7.     The Proposed Settlement Is The Product
Of Informed Arm's-Length Negotiations**

There is a "'strong initial presumption that the compromise is fair and reasonable'" where

"the settlement was reached after arms-length negotiations," after sufficient discovery, supported

by those experienced in similar litigation, and there are few objections.  *Rolland,* 191 F.R.D. at 6.

The presumption applies here.   As a result of informed and experienced representation, the

parties' settlement negotiations were nothing less than hard-fought and required two formal full-

day mediation sessions, which were conducted under the direction of Mr. Hughes, a mediator

with extensive experience in the mediation of cases involving employment discrimination.

There is no doubt that the Settlement was reached without collusion and after good-faith

bargaining between the parties.

## V.     THE DIRECT NOTICE TO CLASS MEMBERS SATISFIES DUE PROCESS REQUIREMENTS AND IS REASONABLE

Plaintiffs (through the Claims Administrator) sent a copy of the Notice to the Class

Members by first-class U.S. Mail to their last known or updated addresses. The Notice was

mailed to all Class Members, based on a list provided by Defendants.  Out of 514 Notices sent to

Class Members, only 15 were returned as undeliverable and no updated addresses were

obtainable.  Paul Decl. ¶¶11-12.

The Notice advised Class Members of the essential terms of the Settlement, set forth the

procedure for objecting to the Settlement or opting out of the monetary component of the

Settlement, and provided specifics on the date, time and place of the final approval hearing.  The

Notice also contains information regarding the proposed Plan of Allocation, Class Counsel's fee

and expense application and the application for Service Awards.  The Notice further provides the

-16-

address for a website that has been created for the Settlement, as well as contact information for the Claims Administrator and Class Counsel.   Thus, the Notice provided the necessary information for Class Members to make an informed decision regarding the proposed Settlement, and was the best notice practicable under the circumstances in compliance with the Court's Preliminary Approval Order, Federal Rule of Civil Procedure 23, and due process.[16]

This method of giving notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]."   Fed. R. Civ. P. 23(e)(1).   "Individualized notice by first-class mail ordinarily satisfies the requirement that class members receive the best notice practicable under the circumstances."[17]

## VI.   THE PLAN OF ALLOCATION SHOULD BE APPROVED

Like the settlement itself, the plan of allocation need only be "fair, reasonable, and adequate."   *In re Tyco Int'l, Ltd.,* 535 F. Supp. 2d 249, 262 (D.N.H. 2007).   The goal of an equitable plan of allocation is fairness to the class as a whole, taking into consideration the available facts and evidence, as well as the size of the fund to be distributed.   Here, Plaintiffs created the Plan of Allocation (the "Plan") in consultation with their statistics expert.   The Plan is

---

[16]  It is apparent that even those Bank employees who did not receive the Notice are aware of the Settlement, as evidenced by the fact that three employees who did not initially receive the Notice have contacted Class Counsel and/or the Claims Administrator, and have been determined to be Class Members. Paul Decl. ¶10.   In addition, following issuance of the Notice, Class Counsel have been directly contacted by approximately 20 Class Members. Singer Decl. ¶53.

[17] *In re Compact Disc Minimum Advertised Price Antitrust Litig.,* 216 F.R.D. 197, 218 (D. Me. 2003); *see also Key v. Gillette Co.,* 90 F.R.D. 606, 612 (D. Mass. 1981) (individual notice to exempt female employees in sex discrimination suit fulfilled class action notice requirements); *Nilsen v. York County,* 382 F. Supp. 2d 206, 210-11 (D. Me. 2005) (commending direct mail notice that reached 70% of class members and where 18% participated in settlement).

explained in Question 8 of the Class Notice.  It includes a "Base Award" for every Class Member ($1,000 for one who worked under three months and $1,500 who worked over three months), plus an additional "Earnings Regression Award" which is based on Plaintiffs' statistics expert's linear earnings regression analysis calculating the pay disparity for each Class Member and, as appropriate, his/her Caucasian counterparts with similar tenures at the Bank, based on actual compensation data provided by the Bank. Singer Decl. ¶57. Within 45 days after the Settlement becomes final, the Claims Administrator will send each Class Member who submits a valid Claim Form a check for his/her *pro rata* share of the net Settlement Fund, based on his/her relative Total Award.

There are no objections to the proposed Plan of Allocation.

## VII.   <u>THE SERVICE AWARDS SHOULD BE APPROVED</u>

As contemplated by the Settlement Agreement (Section VIII.F.), Class Counsel requests that the Court approve Service Awards to the eight Named Plaintiffs in the amount of $25,000 each, to compensate them for the time and effort they devoted to representing the Class.  "Courts 'routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.'"  *Lupron,* 2005 WL 2006833, at *7.  In granting incentive awards, "courts consider not only the efforts of the plaintiffs in pursuing the claims, but also the important public policy of fostering enforcement of laws and rewarding representative plaintiffs for being instrumental in obtaining recoveries for persons other than themselves."  *Bussie*, 1999 WL 342042, at *3 (citations omitted).

In other employment discrimination cases, courts have granted service awards that exceed or equal the amount requested here.[18]   Each of the Named Plaintiffs offered valuable assistance in Class Counsel's investigation of the discrimination claims, participated in numerous interviews to gather information for the complaints and subsequent briefing, responded to document requests and interrogatories, and participated in status and conference calls with Class Counsel.   Additionally, two of the Named Plaintiffs participated in person in the mediation sessions and all Named Plaintiffs were in contact with Class Counsel prior to and throughout the settlement process.   Singer Decl. ¶61.   Each of the Named Plaintiffs effectively fulfilled their obligations as representatives for the Class.   Further, in addition to the employment-related claims released by the other Class Members, the Named Plaintiffs provided the Bank with a general release of claims.[19]

---

[18] See, e.g., Curtis-Bauer, 2008 WL 4667090 ($25,000 service award plus $125,000 for release of non-class claims approved in gender discrimination suit); Ingram v. Coca-Cola Co., 200 F.R.D. 685 (N.D. Ga. 2001) (granting $300,000 per named plaintiff service awards in race discrimination suit); Roberts v. Texaco, Inc., 979 F. Supp. 185, 203-04 (S.D.N.Y. 1997) (granting service awards ranging from $25,000 to $85,000 in race discrimination suit); Amochaev v. Citigroup Global Markets, Inc., Case No. 3:05-cv-01298 (N.D. Cal. 2008) (Document #195) (granting service award of $50,000 to initial named plaintiffs in gender employment discrimination suit).

[19]   See Settlement Agreement, ¶V.B.   Plaintiffs also wish to inform the Court that, as of September 16, 2009, BAI and Named Plaintiff Timothy Johnson II have entered into an agreement resolving fully the claims and counterclaims asserted in an arbitration pending under the auspices of FINRA Dispute Resolution, Inc.   Such arbitration was commenced prior to this lawsuit, and plaintiff Johnson retained separate counsel to represent him in connection with that arbitration.   Class Counsel have been also informed by Defendants that, effective August 25, 2009, the Bank entered into a separate agreement with an absent Class Member, Victor Emeogo, and a county agency in the State of Maryland, resolving a charge brought by Mr. Emeogo against the Bank before that agency.   Among other provisions, the settlement preserves Mr. Emeogo's right to participate in this Settlement.   Mr. Emeogo was not represented by Class Counsel in that proceeding.

The Named Plaintiffs also faced the threat of retaliation as a result of their participation in the lawsuit, and several of the Named Plaintiffs were in fact terminated following their involvement in the case.[20]  Thus, here, the requested $25,000 Service Awards are fully justified where each Named Plaintiff "expend[ed] considerable time and effort on the case, especially by advising counsel, [and] when the representatives risk retaliation as a result of their participation." *Coca-Cola*, 200 F.R.D. at 694.

The Class Notice informed Class Members that Class Counsel would apply for a total of $200,000 in Service Awards for Named Plaintiffs, and no Class Member objected.

## VIII.   CONCLUSION

For the foregoing reasons, Named Plaintiffs respectfully request that the Court grant final approval of the Settlement and Plan of Allocation, and enter the proposed Final Judgment And Order Of Dismissal With Prejudice and proposed Order Approving Plan Of Allocation And Service Awards.

Dated:  October 9, 2009                         Respectfully submitted,

                                                BERNSTEIN LITOWITZ BERGER
                                                & GROSSMANN LLP


                                                By:   */s/ Steven B. Singer*
                                                      Steven B. Singer

                                                Steven B. Singer (*pro hac vice*)

---

[20] *See In re Compact Disc Minimum Advertised Price Antitrust Litig.,* 292 F. Supp. 2d 184, 189 (D. Me. 2003) (recognizing that Named Plaintiffs may face additional risks of retaliation in employment cases, thus warranting large incentive award); *see also In re Automotive Refinishing Paint Antitrust Litig.,* 2008 WL 63269, at *7 (E.D. Pa. Jan. 3, 2008) (granting $30,000 incentive awards based in part on risks incurred).

Jeremy P. Robinson (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Tel:  (212) 554-1400
Fax:  (212) 554-1444
  -and-
Niki L. Mendoza (*pro hac vice*)
Matthew Jubenville (*pro hac vice*)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:  (858) 793-0070
Fax:  (858) 793-0323


MAJOR KHAN LLC
Major Khan
20 Bellevue Terrace
Weehawken, NJ 07086
Tel:  (646) 546-5664
Fax:  (646) 546-5755

*Counsel for Named Plaintiffs Richard Turnley III, Baron H.C. Finlayson, Coleen Alecia Hinds, Mark-Anthony Brown, Timothy Johnson II, Khairi Dwayne Rahman, Rahmel Hobbs, and Terry M. Gravely and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 9, 2009, I caused the foregoing document to be served on the parties named below by electronic mail and U.S. Mail:

Frances S. Cohen (BBO #542811)  
Ralph C. Martin, II (BBO #322660)  
Louis A. Rodriques (BBO #424720)  
BINGHAM MCCUTCHEN LLP  
One Federal Street  
Boston, MA  02110-1726

Jeffrey G. Huvelle  
Thomas S. Williamson, Jr.  
COVINGTON & BURLING LLP  
1201 Pennsylvania Avenue, N.W.  
Washington, D.C.  20004-2401

Dated: San Diego, California  
      October 9, 2009

         */s/ Niki L. Mendoza*  
         Niki L. Mendoza (*pro hac vice*)  
         Bernstein Litowitz Berger & Grossmann LLP